# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 13-1428

**STATE IN THE INTEREST OF J.B.**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 11-JV-16257
HONORABLE CHARLES LEE PORTER, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**SHANNON J. GREMILLION
JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, James T. Genovese, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**Charlotte G. Bordenave**
**Mental Health Advocacy Service**
**302 Dulles St., Room U-47**
**Lafayette, LA 70506**
**(337) 262-2030**
**COUNSEL FOR APPELLEE:**
**J.B. (child)**
**Lewis H. Pitman**
**Public Defender's Office**
**106 W. Berard St.**
**St. Martinville, LA 70582**
**(337) 394-1446**
**COUNSEL FOR APPELLEE:**
**C.B. (father)**

**Philip J. Haney, District Attorney**
**Sixteenth Judicial District Court**
**Thailund Porter-Green, Assistant District Attorney**
**415 S. Main St.**
**St. Martinville, LA 70582**
**(337) 276-6034**
**COUNSEL FOR APPELLEE:**
        **St. Martinville Parish District Attorney's Office**

**S. Marie Johnson**
**Public Defender's Office**
**106 W. Berard St.**
**St. Martinville, LA 70582**
**(337) 394-1446**
**COUNSEL FOR APPELLANT:**
        **J.N. (mother)**

**Tamara D. Rahim**
**State of Louisiana,**
**Department of Children and Family Services**
**825 Kaliste Saloom Road**
**Brandywine 3, Room 150**
**Lafayette, LA 70508**
**(337) 262-2250**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana,**
        **Department of Children and Family Services**

**GREMILLION, Judge.**

The mother, J.N., appeals the trial court's judgment terminating her parental rights to J.B.[1]  For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

J.B. was born in March 2011, with cocaine in his system.  J.B. was removed from J.N.'s custody pursuant to an instanter order, and was later adjudicated in need of care in May 2011.  The State of Louisiana, through the Department of Children and Family Services (DCFS), filed a Petition for Termination of Parental Rights and Certification for Adoption on February 4, 2013.  The trial court terminated J.N.'s rights to J.B. on April 22, 2013, from which a judgment issued on June 13, 2013.  J.N. now appeals.

## ASSIGNMENTS OF ERROR

J.N. assigns as error:

1. Whether the trial court erred in granting judgment in favor of the State of Louisiana terminating the parental rights of [J.N.] to the minor child, J.B.?

> A. Whether the evidence adduced at trial on the motion to terminate parental rights showed a lack of substantial compliance with the case plan for services, which had been previously filed by the department and approved by the court as necessary for the safe return of the child;

> B. Whether the evidence adduced at trial on the motion to terminate parental rights showed that despite earlier intervention, there was a reasonable lack of expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable and permanent home; and

> C. Whether the evidence adduced at trial on the motion to terminate parental rights showed that the State had met its statutory obligation to remove the impediments to

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rule 5-2, initials are used throughout to protect the identity of the minor.

reunification prior to seeking termination of parental rights?

## LAW AND DISCUSSION

We have stated that "[p]arental rights to the care, custody, and management of children is a fundamental liberty interest warranting great deference and vigilant protection under the law." *In re J.K.*, 97-336, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1154, 1156. *See also Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388 (1982). Accordingly, a parent has a strong interest in the accuracy of a decision to terminate her rights. *Lassiter v. Dep't of Soc. Servs. of Durham County, NC*, 452 U.S. 18, 101 S.Ct. 2153 (1981). Thus, the Louisiana legislature has imposed strict standards that require the State to prove, by clear and convincing evidence, the grounds for termination under La.Ch.Code art. 1015 before a judgment can be issued terminating parental rights. *In re J.K.*, 702 So.2d 1154.

This analysis requires a balancing of the child's interests and the parent's interests; however, it has been repeatedly held that the interests of the child are paramount over that of the parent. *In re J.A.*, 99-2905 (La. 1/12/00), 752 So.2d 806. In that case, the supreme court stated:

> The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens.

2

*Id.* at 811 (citation omitted).

We will not reverse the trial court's determination regarding the termination of parental rights will not unless it is manifestly erroneous or clearly wrong. *In re V.F.R.*, 01-1041 (La.App. 3 Cir. 2/13/02), 815 So.2d 1035, *writ denied*, 02-797 (La. 4/12/02), 813 So.2d 412.

Louisiana Children's Code Article 1015(5) sets forth the following as grounds for involuntary termination:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Louisiana Children's Code Article 1036(C) states:

> Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
>
> (1) The parent's failure to attend court-approved scheduled visitations with the child.
>
> (2) The parent's failure to communicate with the child.
>
> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
>
> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
>
> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
>
> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

3

(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

The trial court's judgment stated that it found by clear and convincing evidence that J.N.'s rights should be terminated because:[2]

[G]reater than one year has elapsed since this child was removed from the parents' custody; that said parents have failed to provide significant contribution to the child's care and support for any six month period; that said fathers have failed to maintain significant contact with the child by not visiting him or communicating with him for any period of six consecutive months; that said parents have failed to substantially comply with their respective case plans including but not limited to failing to complete substance abuse treatment, failing to comply with mental health treatment, failing to obtain and maintain adequate and stable housing, failing to visit with the child as scheduled, and lack of substantial improvement in redressing the problems preventing reunification; that there is no reasonable expectation of significant improvement in said parents' condition or conduct in the near future; and, that the termination of parental rights is in the best interest of the minor child, [J.B.], for the reasons orally assigned.

The State's case plan for J.N. included:

1. [J.N.] will attend and complete a substance abuse aftercare program and will sign consent forms.
2. [J.N.] will submit to random drug screens.
3. [J.N.] will maintain a safe home that adequately meets the needs of her child with utilities connected.
4. [J.N.] will participate in mental health treatment and medication management.
5. [J.N.] will participate in parenting classes.
6. [J.N.] will participate to completion.
7. [J.N.] will maintain contact with [J.B.] through the visitation contract devised on March 6, 2012.
8. [J.N.] will cooperate with the agency and make herself available for contact.

The case plan then provides for specifics for meeting each of these goals.

For example, under the "Housing/Food/Basic Needs" section, J.N. is required to maintain "the same home for six months, keeping it free of safety hazards,

---

[2] The parental rights to J.B. of the legal father, C.B., and of the biological father, C.N., were also terminated at the same time.

maintaining a food supply, and keeping the home clean." In that same section, she is required to send a money order for $25.00 to DCFS for the care of J.B.

In the section pertaining to the parent's mental and emotional health, J.N. is required to participate in inpatient/outpatient mental health treatment and medication management. In the section pertaining to the parent's substance abuse, J.N. is required to submit to random drug tests, participate in an aftercare program provided by Lafayette Addictive Disorders and Clinic and obtain a sponsor and attend NA/AA meetings at least once a week. Additionally, J.N.'s case plan in the area of day-to-day parenting includes completion of various parenting programs requiring weekly attendance.

*Evidence and Testimony*

A letter submitted into evidence by Lafayette Addictive Disorders Clinic indicated that J.N. graduated from the aftercare program on June 19, 2012, that her attendance was regular with few absences, and that she had no positive urine screens after her initial screen at the beginning of treatment. Attached were the results of five drug screens taken from January 2012 through May 2012. The January screen indicated that J.N.'s urine tested positive for opiates.

Gulf Coast Teaching Family Services, Inc. composed a letter regarding J.N.'s progress in completing parenting classes for those in substance abuse treatment and recovery. She completed the classes in May 2012. The instructor rated J.N.'s participation during class as "poor-below average."

A January 2013 letter from The Extra Mile, a parenting resource center, indicated that it declined to accept J.N. into its program. The letter noted that the center "has previously worked with [J.N.] completing some individual parenting education. Per the closing report [J.N.] became very upset on April 5, 2012

because the worker could not meet [J.N.] at a park in Lafayette. [J.N.] raised her voice and started cursing and screaming and was unable to calm down."

Photos were submitted in evidence showing J.N. sleeping on two chairs at a visit with J.B. in October 2012. Various drug screens were submitted into evidence. As noted above, a January 6, 2012 drug screen was positive for opiates. The February, March, April, and May drug screens were negative. A November 1, 2012 hair substance abuse panel was positive for cocaine use; a November 7, 2012 test was positive for opiates. A December 5, 2012 test was negative. A February 22, 2013 test was negative.

A letter from the Lafayette Addictive Disorders Clinic dated March 5, 2012, indicated that J.N.'s primary diagnosis is psychiatric and her substance abuse secondary. The letter stated that "Given her fragile condition we consider that [J.N.] exceeded our expectations . . . . We consider [J.N.] to have reached maximum benefit from treatment, but vulnerability to relapse likely remains above average considering the multiplicity of dysfunctions within her past and present."

J.N. and foster care workers testified at the April 22, 2013 hearing. Bobby Bernard, a foster care worker with DCFS, discussed how J.B. initially came into care and the case plan formulated for J.N. Bernard said that J.N. was evicted from her apartment in May 2011. The following day she married C.B., a convicted sex-offender, and they moved to Duson where they resided until July when C.B. was incarcerated. Thereafter, J.N. was either homeless or staying with relatives. From January 2012, until the time of trial, J.N. had maintained a one-bedroom rental home. Bernard said that C.B. would sometimes reside with J.N. when he was not in jail despite a court order restraining C.B. from having contact with J.N. Bernard said that J.N. and C.B. have an extended history of domestic violence, which he

6

had personally witnessed on several occasions. J.N. and C.B. were divorced in February 2013.

Bernard said that J.N. paid the $25.00 parental contribution only once in the past two years. However, on cross-examination he recalled that in March 2012, the trial court suspended her payments due to inability to pay.

Bernard discussed J.N.'s attempts at substance abuse treatment. Bernard said that J.N. completed outpatient treatment and attended an aftercare program and three NA/AA meetings per week from January 2012, through June 2012. Bernard said that J.N. was supposed to be admitted for treatment in April 2013, but that she refused to go.

Bernard discussed J.N.'s mental health treatment. In May 2011, J.N. underwent a psychological evaluation with Dr. Ed Bergeron who diagnosed her with bipolar disorder, cocaine dependence, and dependent personality disorder. J.N. was receiving services through Tyler Mental Health. In late June, a Physician's Emergency Certificate (PEC) was issued committing her to Compass Behavioral Center in Kaplan. She was discharged six days later. By mid-August 2011, Bernard testified that J.N. was having suicidal thoughts so he personally transported her to the emergency room at University Medical Center. She was discharged later that day. In late August 2011, Bernard brought J.N. to Red River Treatment to address her substance abuse and mental health issues. J.N. was at Red River Treatment Center for approximately thirty minutes when Bernard was called to return and pick her up because she had assaulted a staff member resulting in the staff member having a broken finger.

In September 2011, J.N. was hospitalized at Compass because she threatened someone with a knife. There she was diagnosed with schizoaffective

disorder. She continued to receive treatment at Tyler Mental Health with a Ms. Fox. However, it was later decided that J.N. should receive outpatient services through Resource Management. J.N. received services from Louise Leger, a licensed professional counselor. Thereafter, Yolanda Phearse, a mental health professional at Resource Management, treated J.N. on an outpatient basis two to three times per week from August 2012, to December 2012.

In December 2012, J.N. was transferred to a new licensed professional counselor with Resource Management, Carla Boudreaux. However, J.N. missed several appointments, resulting in her case being closed by Resource Management in March 2013. Immediately after the meeting closing the case, Bernard offered to take J.N. to Loving Hearts for services but she refused.

Bernard said that while J.N. was in the care of Resource Management, she received therapy and medication management. J.N. was prescribed various medications including, initially, Celexa, Vistaril, and Zyprexa by a Dr. Concepcion, whom she saw monthly from May until December 2012. At one point, she was prescribed Zyprexa, Latuda, and Wellbutrin. However, at the time her case was closed, she was not taking her medication.

Regarding visitation with J.B., J.N. was scheduled to visit weekly. Bernard said that J.N. complied with the visitation aspect of her case plan. However, he said that at times J.N. interacted well with J.B., whereas other times she was having a bad day and did not interact with him. He testified regarding the October 2012 visit when J.N. was asleep in the chair.

Bernard said that J.B. has been in the state's care for over two years in the same foster home since he was ten days old. He said that J.B. is doing great and

8

that the foster parents indicated that they would adopt him if he became available for adoption.

Phearse testified that she treated J.N. from October 2012, through December 2012, for depression and focused on life skills training, parenting skills, socialization, and improving self-esteem. Phearse met with J.N. at least twice a week at her home. Phearse said J.N. was "very cooperative." However, on December 26, 2012, Phearse accompanied J.N. to look at Section 8 housing that J.N. was considering moving into. Phearse advised J.N. that there were problems with the unit. Phearse said that J.N. became upset with her so they proceeded to return to St. Martinville. Phearse said that she told J.N. she had to wear her seatbelt. She said J.N. started cursing at her and kicked the door of her vehicle when she dropped her off at home. Phearse said that she got out of her car to see if there was a dent and J.N. came toward her stating, "You want to fight?" Since that incident, Phearse has not had contact with J.N. except in court. On cross-examination, Phearse said that this behavior would not be unusual for someone with untreated bipolar disorder.

Boudreaux, a licensed mental health professional with Resource Management, testified that she had six appointments scheduled with J.N. in February and March 2013, but that J.N. only attended one. Due to missing the sessions, J.N. was discharged.

J.N. testified that she enjoyed her parenting classes and completed them. She said that is not currently taking any medication for mental illness. She receives $698.00 per month in social security disability benefits and $198.00 in food stamps.

The trial court found that the state proved by clear and convincing evidence that grounds existed to terminate J.N.'s rights and that it was in the best interest of J.B. to do so finding:

> [E]ven though there is a broken system of Mental Health Care in this case, the other testimony shows sometimes a rise and other times a great fall by this parent, which is really unpredictable and does not bored [sic] well for her as a parent – as a parent in this case. The evidence, over a period of two years, is still unpredictable and not predictable enough to warrant continuation of this process.

### Compliance with Case Plan

The substance of J.N.'s argument is that she substantially complied with the State's case plan. J.N. argues that the State failed to provide her with the necessary services, pointing out that J.N. was only scheduled to meet with her psychiatrist once per month even though she was scheduled to meet with other mental health professionals weekly.

J.N. further argues that she attended outpatient substance abuse treatment and "exceeded their expectations," attending three NA/AA meetings per week. J.N. claims that she obtained stable housing in January 2012, which she has consistently maintained. J.N. further argues that she completed parenting classes as part of her case plan. J.N. claims that the State failed to prove by clear and convincing evidence that her mental health diagnoses exposed J.N. to a substantial risk of harm.

We agree that J.N. did complete various parts of her case plan including attending outpatient substance abuse treatment, AA/NA meetings, weekly therapy sessions, and visitations. However, J.N. has failed to pass drug screens and maintain her mental health treatment. After her relapse, the State made many attempts to get her substance abuse treatment again. However, J.N. thwarted its

10

efforts by failing to cooperate, either by injuring the staff worker or simply refusing to attend. While this may be partly due to the way the system works, J.N.'s own violent behavior has caused her to be dismissed from the care that she needs. Some measure of personal responsibility must be accepted by the person seeking the return of her child. J.N. has taken none. Moreover, even assuming that she substantially complied with her case plan, there simply is no reasonable expectation of significant improvement such that it would be in the best interests for J.B. to be returned to J.N.'s care.

***Reasonable Lack of Expectation of Significant Improvement***

Louisiana Children's Code article 1036(D) states:

> Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent's conduct in the near future may be evidenced by one or more of the following:
>
> (1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
>
> (2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
>
> (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

J.N. argues that the State failed to prove that her mental illness diagnosis exposed her child to a risk of serious harm. We disagree. J.N. has ongoing mental health issues that are intertwined with her substance abuse issues. As the trial court noted, her progress waxes and wanes. Her behavior is unpredictable and can be extremely aggressive, even toward those with whom she has had a past friendly

11

working relationship. J.N. slept on the reception chairs at her assigned visit with J.B. J.N. attributes these problems to inadequate treatment of her mental health issues due to her psychiatrist's departure from the employ of Resource Management. However, J.N. readily admitted that she refused to take her medication. Although it can take time to find the right medication to manage a person's mental health issues, the State has provided several opportunities for J.N. to receive treatment, including various inpatient treatments that she either refused or were dismissed from.

J.N. similarly argues that there is a reasonable expectation of reformation. Louisiana Children's Code Article 1036(C) illustrates the considerations that the trial court takes in determining whether there is a reasonable expectation of reformation. Mere cooperation with DCFS is inadequate; the parent must show improvement over time even if all of the problems that caused the removal have not been eliminated. *In re S.M.*, 98-922 (La. 10/20/98), 719 So.2d 445. This requires that the parent significantly modify the behavior that caused the removal. *Id.* J.N. has failed to improve in maintaining treatment for her mental health issues and in refraining from using illicit substances.

J.N.'s pattern of behavior indicates that there is a reasonable lack of expectation of significant improvement or reformation. The trial court did not manifestly err in finding that it would be in the best interest of J.B., who has been in a stable foster home since he was ten days old, to be released for adoption.

## CONCLUSION

The judgment of the trial court terminating J.N.'s parental rights to J.B. is hereby affirmed. All costs of this appeal are assessed to J.N.

**AFFIRMED**.

12